UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:12-cr-00178-JAW |
| | ) | |
| KEVIN ST. HILL | ) | |

**PRESENTENCE ORDER**

Facing sentencing on the charge of distribution of oxycodone, Kevin St. Hill challenges his criminal history category of IV as over-representing the seriousness of his criminal background and the likelihood of his recidivism under United States Sentencing Guideline § 4A1.3(b). The Court defers ruling on this issue until the sentencing hearing. Mr. St. Hill also objects to the Probation Office's inclusion of certain drug sales as relevant conduct under United States Sentencing Guideline § 1B1.3 in calculating drug quantity. Having reviewed the police and other reports submitted by the parties, the Court concludes that the Probation Office correctly included these sales as relevant conduct in calculating Mr. St. Hill's drug quantity. In doing so, the Court rejects Mr. St. Hill's argument that a higher standard of proof should apply to relevant conduct determinations because his argument is based on obsolete caselaw inconsistent with First Circuit precedent.

I.      BACKGROUND

Kevin St. Hill pleaded guilty to the distribution of oxycodone, a violation of 21 U.S.C. § 841(a)(1), and awaits sentencing. At the Presentence Conference, the Court raised one issue and the attorneys raised another, each of which seemed to merit a written order. The Court questioned whether Mr. St. Hill's January 16,

2011 New York State conviction for Tampering with Physical Evidence should count as a prior conviction for purposes of his criminal history. The attorneys disputed whether evidence of other oxycodone and illegal drug sales should be deemed relevant conduct for purposes of Mr. St. Hill's drug quantity calculation; in his memorandum, Mr. St. Hill questioned the credibility of one of the Government's informants.

### A.     The Tampering with Physical Evidence Conviction

The Revised Presentence Investigation Report dated March 27, 2013, indicates that on January 16, 2011, Mr. St. Hill was convicted of Tampering with Physical Evidence and was sentenced to time served. *Revised Presentence Investigation Report* ¶ 24 (Mar. 27, 2013) (PSR). The PSR indicates that on January 15, 2011, an officer approached Mr. St. Hill, who was inside a public housing building in violation of posted rules, and Mr. St. Hill threw a bag containing marijuana to the ground; Mr. St. Hill was arrested.[1] *Id.* Given the date of the arrest and the date of sentencing, Mr. St. Hill was sentenced to no more than one day incarceration.

### B.     Relevant Conduct

#### 1.     The Presentence Investigation Report

When Mr. St. Hill entered his guilty plea on December 19, 2012, he admitted that the contents of the Government's Version of the Offense were true. The

---

[1]     The PSR actually says that an officer approached Mr. St. Hill on January 15, 2010, but the Court suspects that in light of the other January 2011 dates in the PSR regarding this incident, the 2010 date is a typographical error. PSR ¶ 24. On that assumption, the Court uses January 15, 2011 as the date in this Order. Whether the officer approached Mr. St. Hill on January 15, 2010 or January 15, 2011 does not change the Court's conclusions.

2

Government's Version of the Offense states that on June 26, 2012, a confidential informant placed a recorded telephone call to Mr. St. Hill and arranged for the purchase of oxycodone pills; later that day, Mr. St. Hill sold the confidential informant and an undercover DEA Task Force Agent twenty pills for $600. *Gov't's Version of the Offense* (ECF No. 20). The Probation Office (PO) calculated the drug quantity of those pills to equal 0.56 grams of oxycodone. PSR ¶ 3. This much is not contested.

However, when the PO prepared the PSR, it included a number of other transactions in its calculation of total drug quantity. First, the PSR states that on April 18, 2012, Mr. St. Hill sold a confidential informant 3.7 net grams of cocaine base for $600. PSR ¶ 3. Next, the PO includes the drug quantity from another confidential informant who said he/she received five 30 mg oxycodone pills from Mr. St. Hill per day during the entire month of January 2012 and twenty 30 mg oxycodone pills per day from February 2012 through May 2012. PSR ¶ 4A. Based on this information, the PO held Mr. St. Hill responsible for 2,555 additional 30 mg pills, equivalent to 76.65 grams of oxycodone. PSR ¶ 4A. The PO also included a fourth confidential informant's statement that he/she obtained oxycodone from Mr. St. Hill for one week in April or May 2012, purchasing ten 30 mg oxycodone pills from him on each of three occasions. PSR ¶ 4B. Based on this statement, the PO added 0.9 grams of oxycodone to Mr. St. Hill's drug quantity.

In total, the PO held Mr. St. Hill accountable for 78.11 grams of oxycodone and 3.7 grams of cocaine base. PSR ¶ 5. The PO calculated the marijuana

equivalency as 536.54 kilograms, resulting in a base offense level of 28 under U.S.S.G. § 2D1.1(c)(6).  PSR ¶¶ 5, 10.

### 2.    Kevin St. Hill's Calculations

Mr. St. Hill objects to the inclusion of the drug transactions described in paragraph 4A of the PSR.  *Def.'s Mem. Regarding Sentencing* at 1-15 (ECF No. 34) (*Def.'s Mem.*).  He maintains that the only transactions similar to the June 26, 2012 transaction to which he pleaded guilty were the sale of 3.7 net grams of cocaine base to a confidential informant on April 18, 2012 and the three sales of ten 30 mg oxycodone pills each to another confidential informant in April or May 2012.  *Id.* at 2-3.  Isolating those three sales and combining them with the June 26, 2012 controlled buy, Mr. St. Hill argues that he should be held accountable for 3.7 grams of cocaine base or 13.213 kilograms of marijuana equivalent and 1.46 grams of oxycodone or 9.782 kilograms of marijuana equivalent for a total relevant drug quantity of just under 23 kilograms of marijuana equivalent, resulting in a base offense level of 18, instead of the PO's recommended base offense level of 28.  *Id.* at 3.

To buttress his contention, Mr. St. Hill begins with the premise that, for a drug offense, not all other drug transactions necessarily constitute "relevant conduct" under the Guidelines.  *Id.* at 4.  He notes that relevant conduct encompasses both "all acts and omissions committed . . . during the commission of the offense of conviction", U.S.S.G. § 1B1.3(a)(1)(A), and "all acts and omissions described in subdivision[] (1)(A) . . . that [was] part of the same course of conduct or

4

common scheme or plan as the offense of conviction . . . ."  U.S.S.G. § 1B1.3(a)(2).
He contends that as the transaction that constituted the offense of conviction was
for small, user levels of drugs, the larger transactions described in paragraph 4A do
not meet the standards in § 1B1.3(a)(2) for relevant conduct.

For support, Mr. St. Hill cites *United States v. Cyr*, 337 F.3d 96 (1st Cir.
2003), in which, he says, the First Circuit "affirmed that heroin and Xanax offenses,
committed during the same time frame, may not constitute 'relevant conduct' under
the Guidelines."  *Def.'s Mem.* at 4.  He emphasizes the comment in application note
9 for U.S.S.G. § 1B1.3, which says that for offenses to be part of a "common scheme
or plan", "they must be substantially connected to each other by at least one
common factor, such as common victims, common accomplices, common purpose, or
similar <u>modus</u> <u>operandi</u>."  *Id.* at 5 (quoting U.S.S.G. § 1B1.3 cmt. n.9(A)).  He adds
that, in applying this provision, the First Circuit has instructed that the district
court must consider the "nature of the offenses, their timing, their commonalities,
and the existence or non-existence of overarching patterns."  *Id.* (quoting *United
States v. Eisom*, 585 F.3d 552, 557 (1st Cir. 2009)).

### 3.    The Government's Response

In response, the Government points out that although it has the burden to
demonstrate a nexus between the offense and the conduct, it may satisfy that
burden by a preponderance of the evidence, and the rules of trial evidence do not
apply, allowing the district court to consider any dependable information.  *Gov't's
Resp. to Def.'s Mem. Regarding Sentencing*, 1-2 (*Gov't's Opp'n*) (citing *United States*

*v. Batista*, 239 F.3d 16, 21 (1st Cir. 2001)).  Based on the statements of confidential informants, the Government contends that the evidence establishes that Mr. St. Hill was a "large scale drug trafficker and sold cocaine, crack and oxycodone pills in the Augusta, Maine area."  *Id.* at 3.  The Government argues that the relevant conduct involved the same drugs and the same customers during the same time period and in the same geographic area as the offense conduct.  *Id.* at 4-6.  The Government contends that the information provided by the confidential informants is sufficiently reliable to support the drug quantity calculation.  *Id.* at 6-8.

### 4.    Mr. St. Hill's Supplemental Memorandum

In his Supplemental Memorandum, Mr. St. Hill raises the "tail wags the dog" argument, namely that the relevant conduct, rather than the offense itself, will drive the sentence.  *Def.'s Supplemental Mem. Regarding Sentencing*, 2-4 (ECF No. 39) (*Def.'s Supp.*).

### C.    Reliability of CI-3

### 1.    Kevin St. Hill's Skepticism

With one exception, Mr. St. Hill does not dispute the contents of the police investigation reports which link him to other illegal drug sales.  He does, however, protest the Court's reliance on information provided by CI-3, one of the informants.

The PSR sets forth CI-3's allegations against Mr. St. Hill:

One confidential informant (hereinafter CI-3) advised that he/she obtained 30 mg Oxycodone pills from St. Hill between January and at least May 2012, which he/she subsequently resold.  CI-3 reported that in January 2012, he/she received a conservatively estimated five (30 mg) Oxycodone pills per day for the 31 days in January.  Therefore for the month of January 2012, it is conservatively estimated that he/she

purchased 155 (30 mg Oxycodone pills) from St. Hill.  CI-3 advised that from February 2012 through May 2012, he/she purchased an estimated 20 (30 mg) Oxycodone pills per day from St. Hill.  Since that period contains a total of 120 days, it is estimated that he/she purchased 2,400 (30 mg) Oxycodone pills from St. Hill between February 2012 and May 2012.  Therefore, St. Hill is accountable for distributing a total of 2,555 (30 mg) Oxycodone pills to CI-3.  This is equivalent to <u>76.65 grams of Oxycodone</u>.

PSR ¶ 4A (emphasis in original).

Mr. St. Hill asserts that CI-3, whom he identifies as female, was arrested on June 19, 2012, and charged with the illegal possession of oxycodone and hydrocodone.  *Def.'s Mem.* at 11.  He says she was charged by federal indictment on October 24, 2012, with one count of distributing oxycodone on May 9, 2012.  *Id.* at 11-12.  Mr. St. Hill states that on December 14, 2012, CI-3 was arrested on the May 9, 2012 indictment and, upon her arrest, Task Force Officer (TFO) John Bourque told her that the Task Force had had her under surveillance for a long time and knew that she had been dealing with Mr. St. Hill.  *Id.* at 12.  In response, CI-3 admitted that she had been dealing with Mr. St. Hill for a year before her arrest in June and had sold at least 100 pills per day for him.  *Id.*  Mr. St. Hill accuses TFO Bourque of "steer[ing]" CI-3 toward him.  *Id.* at 14.

He says that three days later, CI-3 gave another statement to the police and again identified Mr. St. Hill as the source of her drugs, claiming that he had been her source for about one year before her June 2012 arrest and stating that she got both crack cocaine and powder cocaine from him.  *Id.* at 12.  This time she said that she had begun selling pills for Mr. St. Hill in the winter of 2011 and sold about 100 pills per day for him for about one year.  *Id.*  She identified one of the people

7

involved in a pharmacy robbery on June 18, 2012, as her driver for some of her illegal drug sales. *Id.* She said she had little contact with Mr. St. Hill after her arrest in June 2012. *Id.*

On January 14, 2013, CI-3 gave a third statement to the police in a proffer interview. *Id.* According to Mr. St. Hill, CI-3 "corrected her prior statement regarding her dealings with Mr. St. Hill." *Id.* He says she admitted that she had not gotten the pills from Mr. St. Hill for all the time previously stated, and that she had gotten oxycodone from the person who had robbed the pharmacy in Farmingdale, Maine. *Id.* She acknowledged that she was living with the robber. *Id.* She estimated that she got between five and ten pills per day from Mr. St. Hill when she started dealing with him in January 2012 and got them at this rate for about a month to a month and a half. *Id.* She admitted using between five and ten pills per day during that time. *Id.* After a month and a half, she began getting twenty pills at a time from Mr. St. Hill and would meet him more than once per day. *Id.* She also said that not all the pills she sold to the undercover agent on May 9, 2012, came from Mr. St. Hill because there were 15 mg pills involved in the sale. *Id.* at 12-13. She explained that she obtained a large number of pills from the robber and may have commingled those pills with the pills she had obtained from Mr. St. Hill. *Id.* at 13.

Mr. St. Hill maintains that CI-3 herself "has been known as a large-scale drug trafficker in her own right with independent sources of supply." *Id.* He points to encounters between the police and CI-3 involving drugs, specifically oxycodone

8

and Buspirone, in February 2009. *Id.* He says she was charged with possessing six 80 mg oxycodone pills, found guilty, and sentenced to six months in jail, a $400 fine, and one year probation. *Id.*

He also points to a series of arrests in 2008, which he contends affect CI-3's credibility. *Id.* at 13-14. He asserts that CI-3's arrest in February 8, 2008 for Hindering occurred when the police were looking for her boyfriend, who was wanted on outstanding arrest warrants, and they came to her apartment. *Id.* at 13. Mr. St. Hill maintains that CI-3 denied to the police that her boyfriend was in the apartment, when in fact he was present. *Id.* On April 4, 2008, CI-3 was stopped for speeding and in the car was a male passenger. *Id.* at 14. The male gave a false name and later the police discovered his true name and that he was wanted on an active arrest warrant. *Id.* CI-3 was later stopped, arrested for hindering an investigation, and when her car was searched, the police found drugs and drug paraphernalia. *Id.* Mr. St. Hill argues that CI-3 has "a record of protecting boyfriends, who are also drug users." *Id.* He says that CI-3 tried to pin him as the sole source of her illegal drugs, when he says this accusation turned out to be false. *Id.*

Mr. St. Hill maintains that CI-3's information is itself internally inconsistent. *Id.* He questions how she could have received five to ten pills from him during January and early February 2012 since she says she was consuming that many pills and would have had no means to pay for them. *Id.* Although she asserts that she got twenty pills from Mr. St. Hill daily from February 2012 to May 2012, Mr. St.

Hill argues that she must have also been getting pills from someone else, namely her boyfriend, during that same interval, and specifically at the time of the May 9, 2012 controlled purchase.  *Id.*

Mr. St. Hill stresses that CI-3's report of intensive and ongoing drug dealing with him contrasts with the information provided by other informants, all of whom, he says, restricted their dealings to one-shot, small transactions.  *Id.* at 15.  He argues that "[t]here is nothing about the controlled purchases that supports the regularity or quantity contained in ¶ 4A of the PSR."  *Id.*

Finally, he contends that even if the Court were to find that Mr. St. Hill sold CI-3 oxycodone on multiple occasions, there is no reasonable basis to conclude that the transactions consisted of any specific drug quantity.  *Id.* at 15-16.

### 2.    The Government's Response

The Government responds that CI-3's description of Mr. St. Hill's drug trafficking is consistent with other evidence and should be believed.[2]  *Gov't's Opp'n* at 6-8.  The Governments says that CI-3's account of her dealings with Mr. St. Hill is "corroborated both generally and specifically by the other reports discussing the defendant."  *Id.* at 7.  Other sources, it says, describe Mr. St. Hill as "a major supplier of oxycodone and cocaine in the central Maine region in the first half of 2012."  *Id.* at 7-8.  For example, the Government maintains that "two confidential sources stated that the defendant had access to large quantities of both oxycodone pills and cocaine."  *Id.* at 8.

---

[2]    The Government's memorandum variously refers to CI-3 as "he" and "she".  *Gov't's Opp'n* at 7-8.  However, the police reports confirm that CI-3 is female.

## II.      DISCUSSION

### A.      The Tampering with Physical Evidence Conviction

At the Presentence Conference, the Court noted that the Tampering with Physical Evidence conviction had been given one criminal history point and, as Mr. St. Hill's total criminal history points equaled seven, that he had just edged into Criminal History Category IV.  Were the conviction not assigned a point, he would fall into Criminal History Category III.  Given the description of the incident and the one-day sentence, the Court wondered whether Tampering with Physical Evidence was like Hindering or Failing to Obey a Police Officer, which under United States Sentence Guideline § 4A1.2(c)(1) would not count unless the offense was a felony, the sentence was a term of probation of more than one year or a term of imprisonment of at least thirty days, or the prior offense was similar to an instant offense.  U.S.S.G. § 4A1.2(c)(1).  It turns out, however, that Tampering with Physical Evidence is a Class E felony offense under New York State law.  N.Y. Penal Code § 215.40.  As such, it must be scored.  U.S.S.G. § 4A1.2(c) ("Sentences for all felony offenses are counted").

Mr. St. Hill has argued that, even if the Guidelines require the Court to score this conviction with one criminal history point, the Court should downward depart on the ground that the Criminal History Category IV "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(b)(1).  The Court does not view its decision on the requested criminal history downward departure as

11

requiring a prehearing written opinion and will address Mr. St. Hill's request during the sentencing hearing.

### B.    Drug Quantity and Relevant Conduct

In 1989, the First Circuit explained that, in addressing drug offenses, the Sentencing Guidelines contemplate that the sentencing judge will include the drug quantity for the offense of conviction and for drug transactions that were part of the "same course of conduct or common scheme or plan as the offense of conviction." *United States v. Blanco*, 888 F.2d 907, 909 (1st Cir. 1989) (quoting U.S.S.G. § 1B1.3(a)).   In other words, the "Sentencing Guidelines, as applied to drug cases, require the sentencing judge to determine quantity by including all amounts 'that were part of the same course of conduct or common scheme or plan as the offense of conviction,' whether or not the defendant has been charged with those transactions." *United States v. Batista*, 239 F.3d 16, 20-21 (1st Cir. 2001) (quoting U.S.S.G. § 1B1.3(a)).   Neither the Government nor Mr. St. Hill challenges this premise.   Nor (with the exception of one confidential informant) has Mr. St. Hill challenged the accuracy of the PSR's descriptions of his other drug transactions.

### 1.    The Burden of Proof

In his Supplemental Memorandum, Mr. St. Hill contends that the standard of proof for relevant conduct should be clear and convincing evidence, not a preponderance.   *Def.'s Supp.* at 2 ("Where a sentence is increased dramatically based on relevant conduct considerations, or where the 'tail wags the dog,' at least two courts have held that the standard that must be applied is no longer by a

preponderance of the evidence, but that the Government must present clear and convincing evidence").

The Defendant is wrong. His argument is based on discredited and overruled caselaw; each case on which he relies has been overturned by the court that decided it. To start, he cites *United States v. Kikumura*, 918 F.2d 1084, 1101 (3d Cir. 1990), but in *United States v. Fisher*, 502 F.3d 293, 306-07 (3d Cir. 2007), the Third Circuit expressly overruled *Kikumura*. The *Fisher* Court noted that *Kikumura* was decided under a mandatory Guideline sentence scheme and observed that after *United States v. Booker*, 543 U.S. 220 (2005), the *Kikumura* concerns have been mitigated by an advisory Guideline scheme. *Fisher*, 502 F.3d at 306 ("After *Booker* . . . it is clear that sentencing on facts found by a preponderance of the evidence does not infringe upon a defendant's rights, whether those rights are derived from the Guidelines or the Constitution").

Mr. St. Hill also cites *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997). *See Def.'s Supp.* at 2. But the Second Circuit has overruled *Shonubi* and remanded a case for resentencing "because of the district court's substitution of the clear and convincing standard in place of the mandated preponderance standard." *United States v. Cordoba-Murgas*, 233 F.3d 704, 709 (2d Cir. 2000).

Mr. St. Hill cites the Seventh Circuit case of *United States v. Boos*, 329 F.3d 907, 909-10 (7th Cir. 2003), arguing that it reflects the concern that if relevant conduct, as opposed to the offense of conviction, drives the sentence, the tail would wag the dog. *Def.'s Supp.* at 2. But the Seventh Circuit has disavowed *Boos*. In

*United States v. Reuter*, 463 F.3d 792 (7th Cir. 2006), the Seventh Circuit noted that the debate about relevant conduct being the tail that wags the dog has "been rendered academic by *United States v. Booker*" and reasoned that "there is no need for courts of appeals to add epicycles to an already complex set of (merely) advisory guidelines by multiplying standards of proof." *Id.* at 793.

Finally, the First Circuit has consistently reiterated that the standard for proving relevant conduct is more probable than not and, as in inferior court within the First Circuit, this Court is duty-bound to apply its teachings. *United States v. Eisom*, 585 F.3d 552, 557 (1st Cir. 2009) ("uncharged conduct is relevant if the government proves <u>by a preponderance of the evidence</u> that such uncharged conduct is part of the same course of conduct or common scheme or plan as the charged conduct") (emphasis supplied); *Batista*, 239 F.3d at 21 ("Before uncharged conduct may be used in the sentencing calculus, the burden is on the government to demonstrate a sufficient nexus between that conduct and the offense of conviction. This burden, however, is met by a mere preponderance of the evidence") (internal citations omitted); *Blanco*, 888 F.2d at 909 ("[T]he court could properly find, by a 'preponderance' of the evidence, that Blanco was involved in a 'course of conduct or common scheme or plan,' [U.S.S.G.] § 1B1.3(a)(2), that included both the actual distribution of 125 grams of cocaine and an attempt to distribute several hundred additional grams").

## 2.   Relevant Conduct

The main debate between the Government and Mr. St. Hill is about what drug transactions should be included in the "same course of conduct or common scheme or plan" as the drug trafficking offense for which he now stands convicted. Put differently, the "uncharged conduct must be relevant to the charged conduct." *Eisom*, 585 F.3d at 557. The "uncharged conduct is relevant if the government proves by a preponderance of the evidence that such uncharged conduct is part of the same course of conduct or common scheme or plan as the charged conduct." *Id*.

The Sentencing Guidelines also provide some guidance. In the commentary to section 1B1.3, the Guidelines address the meaning of "common scheme or plan":

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus</u> <u>operandi</u>.

U.S.S.G. § 1B1.3 cmt. n.9(A). The Guidelines also contain an explanation for "same course of conduct":

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.

U.S.S.G. § 1B1.3 cmt. n.9(B).

In *Eisom*, acknowledging that "[t]he relevant conduct guideline can find fertile soil in drug-trafficking cases," the First Circuit explained that, in evaluating whether conduct is relevant, the sentencing court should consider such factors as

15

"the nature of the offenses, their timing, their commonalities, and the existence or non-existence of overarching patterns." *Eisom*, 585 F.3d at 557. The *Eisom* Court emphasized that the district court's determination "represents a practical, real-world assessment of probabilities, based on the totality of proven circumstances." *Id.*

### 3.    The Offense of Conviction

When Mr. St. Hill entered his guilty plea, he admitted the truth and accuracy of the Government's Version of the Offense in his case. *Minute Entry* (ECF No. 23). The Government's Version of the Offense describes a recorded controlled purchase of $600 worth of oxycodone from Mr. St. Hill in Augusta, Maine, on June 26, 2012, by a confidential informant (CI):

> At approximately 2:28 pm on June 26, 2012, a blue Mustang pulled into the parking lot at the prearranged location. The defendant was observed getting out of the passenger seat of the Mustang. The defendant got into the rear passenger seat of the DEA Task Force Agent's vehicle. While in the vehicle, the defendant provided CI with twenty (20) small, light blue pills. CI handed the pills directly to the DEA Task Force Agent. The DEA Task Force Agent then handed $600 to the defendant. The defendant subsequently exited the vehicle.

*Gov't's Version of the Offense* (ECF No. 20).

### 4.    The Admittedly Relevant Drug Sales

In his Memorandum, Mr. St. Hill conceded that two other sales were properly deemed relevant conduct for purposes of calculating his base offense level. *Def.'s Mem.* at 2-3. One is a transaction that took place on April 18, 2012. The PSR describes that offense as follows:

On April 18, 2012, DEA task force officials met with CI-1, who was informed by St. Hill that St. Hill would be willing to sell cocaine base to CI-1 in Lewiston, Maine, as St. Hill had other customers there. St. Hill later contacted CI-1, stated that his "ride fell through," and asked CI-1 to meet at a residence in Augusta, Maine. DEA task force officials searched CI-1 and CI-1's vehicle and found no contraband. They provided CI-1 with $600 cash and outfitted him/her with a recording device. CI-1 subsequently met St. Hill at the residence of Thomas Flynn in Augusta, Maine, where St. Hill was staying. Upon CI-1's arrival at the residence, St. Hill entered CI-1's vehicle and sold <u>3.7 net grams of cocaine base</u>, as confirmed by a laboratory analysis, to CI-1 in exchange for $600.

PSR ¶ 3. The PSR's description of CI-1's involvement is consistent with the content of the applicable police investigation report. *Report of Investigation*, 1-3 (*Def.'s Ex. 3*) (*Ex.* 3).

The second is a series of three transactions that were not part of a controlled buy. These transactions occurred in April or May 2012. PSR ¶ 4B. According to Mr. St. Hill, the description of these sales is found in the investigative reports marked as Defendant's Exhibits 5 and 6. *Def.'s Mem.* at 2-3. Exhibit 5 is a DEA report dated May 7, 2012, that begins on May 4, 2012, with surveillance of a residence in Augusta, Maine, where Mr. St. Hill was reported to be staying. *Report of Investigation* at 1 (*Def.'s Ex.* 5) (*Ex.* 5). The police observed an automobile pull into the driveway of the residence operated by a person known to them from other investigations and known to be cooperating in another unrelated investigation.[3] *Id.* The driver approached the residence, spoke with someone, and then left. *Id.*

The police were aware that the driver was on probation and subject to a search condition. *Id.* They followed the driver and, when he stopped, they

---

[3]    To maintain confidentiality, the Court has referred to this confidential informant as "the driver".

approached and searched him, locating two hypodermic needles. *Id.* at 1-2. The driver agreed to let the police know what was going on. *Id.* at 2. Inside the vehicle, the police discovered one 30 mg oxycodone pill. *Id.* The driver confessed that he had gone to the residence to buy oxycodone pills for his passenger, and that he was met by a black male whom he did not know. *Id.* The male told him that the pills were not ready and to return later. *Id.* The driver said that he and his passenger had planned to return in an hour. *Id.* The driver said that he had been dealing at the Augusta residence with a black male known only as "BB" for about one week and had bought only ten 30 mg oxycodone pills on three occasions. *Id.*

The driver told the police that he had met BB though a female who had been his source of supply for oxycodone pills. *Id.* On April 28, 2012, he had tried to call the female and a male had answered her phone. *Id.* The male told the driver that he was "the man" who supplied the female, and he told the driver to deal directly with him and gave him a telephone number. *Id.* The male introduced himself as BB and gave directions to the Augusta, Maine residence where the police had seen the driver earlier on May 4, 2012. *Id.*

The next day, the driver spoke with the female who had been his source for drugs. *Id.* She told the driver that BB had stolen her telephone after he had beaten her up. *Id.* She told the driver that she had been staying at a motel in Augusta, when she received a call from a female asking to buy pills, and when she opened the door, BB and two other black males beat her up and stole her phone because she owed a debt. *Id.* at 2-3. However, BB gave her phone back a day or so later because

18

she sells a lot of pills for him and she was too valuable to him; he warned her not to mess with his money again. *Id.* at 3. The female told the driver that she sells about six hundred pills every two days for BB. *Id.* The driver said that he was aware that the female sells to numerous people in the Augusta, Maine area. *Id.* The driver said that he still maintained contact with the female, but did not tell her that he was going directly to BB. *Id.* The female told the driver that BB gets one thousand oxycodone pills at a time a couple of times per week. *Id.* The driver did not know how much cocaine BB sells. *Id.* The driver said that the female told him that she had recently sold two handguns to BB, one of which she stated had a laser sight on it. *Id.*

The driver said that each time he had dealt with BB it had been different. *Id.* One time BB refused to allow him inside the residence and met him in a vehicle. *Id.* Another time BB allowed him inside. *Id.* On that occasion, BB removed from his pants a large bag of crack cocaine and a fist-sized bag of oxycodone pills. *Id.*

When he was inside the house, there were about six black males present. *Id.* There was also a black female, two children, and an older white male who owned the house. *Id.* When the driver was inside, BB asked the other males if they wanted to make the sale. *Id.* Then BB handed the driver ten oxycodone pills and when the driver tried to give the money to BB, he pointed to another male and told the driver to give the money to him. *Id.* at 3-4. When the driver tried to give the money to that male, the male pointed to the floor and told him to throw it there. *Id.* at 4.

On May 5, 2012, the driver called the police and told them that he had spoken with the female in order to maintain his relationship with her.  *Id.*  The female had told him that she was upset with BB because he had promised some pills to her and when she went to the Augusta residence to pick up one hundred pills, she was told that BB was out.  *Id.*  BB told her, however, that another one thousand pills would be coming to Augusta on May 5, 2012.  *Id.*

The police report in Exhibit 6 is dated June 27, 2012.  *Report of Investigation*, 1 (*Def.'s Ex.* 6) (*Ex.* 6).  According to Mr. St. Hill, the confidential informant in this report is the same confidential informant as the driver in Exhibit 5.[4]  *Def.'s Mem.* at 2-3.  On June 26, 2012, police met with the driver and formulated a plan for him to buy $600 worth of oxycodone pills from Mr. St. Hill, also known as BB.  *Ex.* 6 at 1.  The driver placed a recorded telephone call to Mr. St. Hill for some oxycodone pills and Mr. St. Hill told him that he could make the sale.  *Id.*  The driver also tried to order cocaine from Mr. St. Hill, but Mr. St. Hill said that he would not have any for a couple of hours.  *Id.*

An undercover agent drove the driver to a location in Augusta, Maine, and about thirty minutes later a blue Ford Mustang pulled into the parking lot.  *Id.*  A white male was operating the Mustang; Mr. St. Hill was in the passenger seat.  *Id.* at 1-2.  Mr. St. Hill got out of the Mustang and got in the rear passenger seat of driver's/agent's vehicle.  *Id.*  Mr. St. Hill provided the driver with twenty small, light blue pills that Mr. St. Hill removed from a baggie.  *Id.*  Mr. St. Hill counted out

---

[4]     The Court was not able to independently verify this assertion because portions of both exhibits were blacked out; the Court has accepted Mr. St. Hill's representation to this effect.

the pills and handed them to the driver, who in turn handed them to the agent.  *Id.*
The agent handed $600 to Mr. St. Hill and Mr. St. Hill left the vehicle.  *Id.*

### 5.    Significant Factors in Determining Relevant Conduct

The Sentencing Guidelines and the First Circuit have pointed to a number of
factors to determine whether conduct is relevant: the nature of the offense, common
victims, common accomplices, common purpose, similar modus operandi, timing,
and the existence or non-existence of other overarching patterns or commonalities.
Here, the offense of conviction and the additional offenses that Mr. St. Hill himself
admits are relevant conduct include a number of common characteristics.  They
involve drug dealing; more specifically, they all involve dealing either oxycodone or
crack cocaine as opposed to other illegal or prescriptive drugs.  Illegal drug
transactions do not have victims as that term is statutorily defined.  *See* 18 U.S.C.
§§ 3663(a)(2), 3663A(a)(2), 3771(e); U.S.S.G. § 3D1.2, cmt. n.2 (observing that there
are no identifiable victims to a drug offense, but that society at large is the victim).
The offense of conviction and the related conduct reveal Mr. St. Hill's accomplices to
include a number of black males, a female drug trafficker, and a man identified as
Thomas Flynn who owned a residence in Augusta where the Defendant stayed and
dealt drugs.  The modus operandi revealed in the cumulative facts show that the
Defendant was a large scale dealer, who was in charge of ordering and receiving
drugs for sale in the Augusta, Maine, and central Maine area (one of the
investigative reports mentions Lewiston, Maine), that he was the leader among his
black male accomplices, that he sold oxycodone 30 mg pills, and that he sold the
oxycodone for about $30 per pill.  The timing of these sales ran from April 18, 2012

21

to June 27, 2012.  Mr. St. Hill was in a blue Mustang when he made some of the

sales.  Mr. St. Hill went by the nickname BB.

### 6.     The Disputed Relevant Conduct: the PSR

The conduct that Mr. St. Hill contends is not relevant is summarized in

paragraph 4A of the PSR:

> Several confidential informants were interviewed regarding St. Hill's
> drug distribution activities.  They consistently stated that St. Hill
> was a large-scale Oxycodone and cocaine base trafficker, who received those
> substances via shipments from New York.  The confidential informants
> reported that St. Hill distributed the drugs in the Augusta and
> Waterville areas of Maine along with four or five other individuals
> from New York.  They described St. Hill as the leader of this group of
> individuals; however, it is not clear from their statements whether this
> meant that he managed the group or directed the activities of any
> other individuals.  The confidential informants also reported that they
> observed St. Hill in possession of firearms while he distributed drugs.
> One confidential informant (hereinafter CI-3) advised that he/she
> obtained 30 mg Oxycodone pills from St. Hill between January and at
> least May 2012, which he/she subsequently resold.  CI-3 reported that
> in January 2012, he/she received a conservatively estimated five (30
> mg) Oxycodone pills per day for the 31 days in January.  Therefore for
> the month of January 2012, it is conservatively estimated that he/she
> purchased 155 (30 mg Oxycodone pills) from St. Hill.  CI-3 advised that
> from February 2012 through May 2012, he/she purchased an estimated
> 20 (30 mg) Oxycodone pills per day from St. Hill.  Since that period
> contains a total of 120 days, it is estimated that he/she purchased
> 2,400 (30 mg) Oxycodone pills from St. Hill between February 2012
> and May 2012.  Therefore, St. Hill is accountable for distributing a
> total of 2,555 (30 mg) Oxycodone pills to CI-3.  This is equivalent to
> <u>76.65 grams of Oxycodone</u>.

PSR ¶ 4A.

The Court readily concludes, based on this description alone, that the conduct

is relevant under U.S.S.G. § 1B1.3(a).  Like the offense of conviction and the

admitted relevant conduct, this paragraph reveals that Mr. St. Hill is a large scale

cocaine and oxycodone trafficker in Augusta and central Maine, that he received large shipments of the drugs, that he had four or five accomplices, that he was the leader of the group, that he possessed firearms, that the oxycodone came in 30 mg pills, and that Mr. St. Hill engaged in this activity from at least January 2012 through May 2012, overlapping the period that includes the offense of conviction and other admittedly relevant criminal conduct, namely the months of April and May 2012.

### 7.   The Disputed Relevant Conduct: The Investigative Reports

The general description of CI-3's activity in paragraph 4A of the PSR is substantially amplified in the investigative reports, reflecting what CI-3 and other confidential sources told the police about BB's conspiracy.

### a.   Defendant's Exhibit One

In an investigative report dated March 26, 2012, the police state that on November 17, 2011, they met with a confidential source who informed them that he/she was familiar with a black male known only as BB, who was a large scale drug trafficker, selling cocaine, crack and oxycodone pills in the Augusta, Maine area. *Report of Investigation*, 1 (*Def.'s Ex.* 1) (*Ex.* 1). The confidential source told the police that BB was originally from New York and obtained the drugs in New York. *Id.* The confidential source also said that he/she observed BB with drugs and a handgun. *Id.* During February and March 2012, the confidential source reported that BB was still actively selling crack, cocaine, and oxycodone in Augusta. *Id.* The

police again met with the same confidential source on March 19, 2012, and the confidential source identified BB as Kevin St. Hill from police photographs. *Id.*

### b.   Defendant's Exhibit Two

The next police investigation report is dated March 30, 2012. *Report of Investigation* (*Def.'s Ex.* 2) (*Ex.* 2). On March 30, 2012, the police met with a confidential source who identified Mr. St. Hill as the leader of an organization in central Maine, specifically Augusta and Waterville, consisting of a group of 4 to 6 other black males, all from New York, who sell oxycodone pills and crack cocaine. *Id.* at 1. The confidential source said that BB stays in Augusta and in Waterville and that BB had moved to Waterville from Augusta because he thought that Augusta was "hot". *Id.*

This confidential source told the police that BB had been in New York for about one week, traveling there with one of his associates. *Id.* at 2. The associate was a very large black male who had been admitted to a New York hospital with a serious respiratory illness, which was life-threatening. *Id.* The confidential source said that BB intended to return to Maine soon to resume his drug trafficking operation. *Id.*

The confidential source said that he/she had known BB for several months and that BB always sold crack and oxycodone. *Id.* The confidential source mentioned that BB obtained oxycodone 30 mg pills from New York City and that they come in multi-thousand quantities. *Id.* The confidential source said that BB obtains crack cocaine in multi-ounce quantities. *Id.* The confidential source told

the police that he/she dealt with BB on several occasions and that BB sold crack for $250 per "8-ball" and $25 per oxycodone pill.  *Id.*

### c.     Defendant's Exhibit Four[5]

On May 2, 2012, the police met with another confidential informant. *Investigative Report* (*Def.'s Ex.* 4) (*Ex.* 4).  He/she told the police that a black male named BB called him and told him that he would sell cocaine to him for $200 per 1/8th ounce.  *Id.* at 1.  Although this confidential informant had never bought cocaine directly from BB previously, he had been around BB a lot and had smoked marijuana with him.  *Id.*  This confidential informant said that he had seen BB deal a lot of cocaine and crack, and had seen him with gallon-size zip-lock bags containing 30 mg oxycodone pills.  *Id.*

The confidential informant told the police that BB had gone to New York City about three weeks before to bring his friend back home; his friend was ill and perhaps dying due to obesity.  *Id.*  This confidential informant was scared of BB, noting that he always carried a gun and had about ten other black males who were from New York City and were gang members.  *Id.*

The confidential informant placed a call to BB, which the police recorded.  *Id.* BB offered to sell an ounce of cocaine for $200 "a ball".  *Id.*  When the confidential informant asked for a better deal, BB told him that $200 for a ball is a deal.  *Id.* at 2.  The confidential informant did not arrange a deal and ended the call.  *Id.*

### d.     Defendant's Exhibits 8, 9, 10 and 11

---

[5]     The substance of the police investigation report in Defendant's Exhibit Three is set forth in PSR ¶ 3.

The focus of the parties' dispute has been the contents of exhibits involving confidential informant CI-3.[6]  These exhibits begin with a newspaper article about a pharmacy robbery in Augusta on June 18, 2012, in which a significant amount of oxycodone was stolen.  *Newspaper Article* at 1 (*Def.'s Ex.* 8).  The article says that a person was arrested the following day and charged with possession of prescriptive medication; this person was CI-3.  *Id.*; *Stip.* ¶ 2.

According to an investigative report dated December 19, 2012, the police re-arrested CI-3 on December 14, 2012, pursuant to a federal arrest warrant.  *Report of Investigation* (*Def.'s Ex.* 9) (*Ex.* 9); *Stip.* ¶ 3.  During a post-arrest interview, CI-3 told the police that she had been selling a lot of oxycodone for BB and that BB had been her main source of supply for both oxycodone and cocaine for approximately one year before her arrest in June 2011.  *Id.* at 2.  She stated that she went to BB several times per day and would get at least twenty oxycodone pills per trip.  *Id.* She estimated that she sold 100 or more pills daily for BB.  *Id.*  BB fronted her the pills and expected her to pay between $26 and $28 per pill after she sold them.  *Id.* She said she also got cocaine and crack cocaine from BB on an as needed basis to supply customers.  *Id.*

CI-3 described the other members of BB's organization.  *Id.*  She said that there were other males in the group and she believed they came from New York.  *Id.* She described one black male who was extremely obese and she told the police the

---

[6]    The parties have stipulated that the female mentioned in Defendant's Exhibits 7 through 15 is CI-3.  *Stipulation* (*Def.'s Ex.* 17) (*Stip.*).

26

nicknames of two other black males, all of whom sold oxycodone, cocaine and crack. *Id.* She said that BB was clearly in charge of the group. *Id.*

CI-3 met with the police again on December 17, 2012, for a proffer interview. *Report of Investigation* (*Def.'s Ex.* 10) (*Ex.* 10). CI-3 said that BB was the source of the oxycodone pills that she sold for about one year before her June 2012 arrest and that she also sold cocaine and crack that she obtained from Mr. St. Hill. *Id.* at 1-2. She said she met Mr. St. Hill in early 2011 and she and a male obtained crack and cocaine through him, usually two to three grams of cocaine and crack at a time, and they would use some and sell some. *Id.* at 2.

Then, according to CI-3, during the winter of 2011, Mr. St. Hill called her, told her he had oxycodone pills, and asked her to sell them for him; she agreed and Mr. St. Hill became a significant source of oxycodone in the central Maine area. *Id.* She reiterated that she paid Mr. St. Hill between $26 and $28 per 30 mg pill and repeated her estimates of the amounts she got per trip, the total amount she sold on any given day, and the length of time she was involved in selling for Mr. St. Hill. *Id.* CI-3 identified the various locations where Mr. St. Hill stayed in Augusta. *Id.* She reiterated that Mr. St. Hill was the leader of the group and named his associates. *Id.*

CI-3 stated that after her June 2012 arrest, she had limited contact with Mr. St. Hill until October 2012; however, she was fired from her job and, to earn money, she started selling again. *Id.* at 3. Since October, she had gone to Mr. St. Hill about twenty times and had gotten between two and ten pills per transaction. *Id.* She

last got oxycodone from Mr. St. Hill one week before her second arrest and he charged her $28 per pill. *Id.* She also described getting drugs from other sources beginning October 2012. *Id.* at 3-4.

CI-3 described an incident when Mr. St. Hill became violent. *Id.* at 4-5. She said that Mr. St. Hill had fronted her oxycodone pills for which she owed $600 and that she had rented a motel room to hide from him until she made enough money to repay him. *Id.* at 4. She said that she received a call from someone claiming to be seeking drugs. *Id.* When she opened the motel door, Mr. St. Hill met her and she was grabbed. *Id.* She reported that Mr. St. Hill threatened her and stole her cellular phone. *Id.* at 4-5. She later learned that Mr. St. Hill had called some of her contacts and told them to start dealing directly with him; however, after a couple of days, he relented but cautioned her not to mess up his money. *Id.* at 5.

CI-3 told the police that she understood the drugs were being brought to Maine by bus and that Mr. St. Hill gets re-supplied once or twice per week. *Id.* at 5.

In CI-3's second proffer interview on January 14, 2013, she clarified some of her earlier statements. *Report of Investigation* (*Def.'s Ex.* 11) (*Ex.* 11). She said that she was in error about the arrest date of June 2011 during her December 14, 2012 interview and clarified that the correct arrest date was June 2012, and that she had been selling drugs for about a year before June 2012. *Id.* at 1. She also said that she got pills from another source from September or October 2011 until about January 2012, and started dealing with Mr. St. Hill then. *Id.* at 2. She began in January 2012 with Mr. St. Hill fronting her small amounts of oxycodone pills,

28

between five and ten pills each time; she would get the pills at least once per day and sometimes more frequently. *Id.* She said Mr. St. Hill expected $26 per pill after she sold them and she was typically able to sell them for $35 per pill. *Id.* She continued to get pills at this rate for about one month. *Id.* After she gained Mr. St. Hill's trust, he fronted her twenty 30 mg pills at a time and she still saw him multiple times per day. *Id.* Mr. St. Hill raised the price per pill from $26 to $27 and then to $28. *Id.* She used between five and ten pills per day. *Id.*

She said that Mr. St. Hill was rarely out of oxycodone and almost never for more than one or two days at a time. *Id.* She recalled one period of a week or two in June 2012 when he was out of pills because there was a problem with a doctor in New York who was writing the prescriptions and may have been charged with writing fraudulent prescriptions. *Id.*

Finally, she said that she was not sure that all of the pills she sold to one of the agents had come from Mr. St. Hill because she had received 15 mg pills from another source that had obtained a large quantity of pills of various milligrams by robbing a pharmacy in Augusta. *Id.* at 3. She said she likely commingled some of the robbery pills with the 30 mg pills she had obtained from Mr. St. Hill. *Id.*

### e.    Government's Exhibit Number 1

The Government submitted one exhibit that reflected a call the city of Augusta police received from a confidential informant on May 8, 2012. *Supplemental Narrative* (*Gov't's Ex.* 1). The caller advised that he was buying Percocet 30's from Mr. St. Hill, that Mr. St. Hill is a black male, and that he goes by

the street name BB. *Id.* at 1. The caller described where Mr. St. Hill lived in the Augusta area. *Id.* The caller also said that Mr. St. Hill sells cocaine and had kilos buried in the backyard. *Id.* He said that he has seen Mr. St. Hill with bags with as many as 1000 to 2000 pills in them. *Id.* The caller said that Mr. St. Hill buys guns from the street and that three black females go to New York to pick up the drugs for him. *Id.* He said that Mr. St. Hill and his posse drive a 2012 Silver Dodge Avenger rental car, a green Jeep, and a blue Dodge Neon. *Id.*

### 8.   Discussion

The Court easily concludes that CI-3's dealings with Mr. St. Hill should be included as relevant conduct as part of a common scheme or plan and part of the same course of conduct under U.S.S.G. § 1B1.3. Comparing the offense of conviction, the acknowledged relevant conduct, the additional information from confidential informants, and CI-3's description of her dealings with Mr. St. Hill, the story of Mr. St. Hill's drug trafficking operation is remarkably congruent. Interwoven through each confidential informant's description are numerous commonalities: (1) the basic allegation — that Mr. St. Hill was a major drug trafficker in central Maine; (2) the drugs — oxycodone, crack cocaine, and sometimes cocaine; (3) the milligram level of the oxycodone pills — 30 mg; (4) the price range per pill — $25 to $30; (5) the area of sale — central Maine generally and specifically Augusta, Waterville, and in one case Lewiston; (6) the residences in Augusta; (7) the use of the Thomas Flynn residence as a base of operations; (8) Mr. St. Hill's role as the leader of the organization; (9) the fact that Mr. St. Hill's

accomplices were black males from New York; (10) the fact that the drugs were delivered in large quantities by bus from New York; and (11) Mr. St. Hill's street name, BB.

By contrast, the sales that the Fourth Circuit held were not part of a common scheme or plan in *United States v. Dugger*, 485 F.3d 236 (4th Cir. 2007), "had different customers, different accomplices, different methods, and different purposes," were separated in time by more than a year, involved different drugs, and took place at different locations. *Id.* at 242. It is true that CI-3 was involved with Mr. St. Hill for a longer time — January 2012 to June 2012 — than the other confidential informants. But there is no temporal gap between the offense of conviction, the admitted relevant conduct, and the additional drug sales described by CI-3. *Cf. Dugger*, 485 F.3d at 242 ("More than a year elapsed between Dugger's sale of crack in Huntington and his sale of marijuana and Xanax in the detention center").

Furthermore, the stories of the different confidential informants about details of the St. Hill operation are remarkably synchronized. For example, two confidential informants were familiar with Mr. St. Hill's heavy-set associate, his associate's serious health problems, and Mr. St. Hill's trip to New York with him for medical care. In addition, CI-3's detailed description of her dispute with Mr. St. Hill, including her staying in a motel, her receiving a call from a person looking for drugs, Mr. St. Hill's appearance at the hotel with an associate, Mr. St. Hill's threatening treatment of her, his theft of her phone, his use of her phone to contact

31

some of her customers, and his relenting, all these facts are echoed in another confidential informant's statements to the police.

The Court concludes that the drug transactions described by CI-3 are relevant conduct under U.S.S.G. § 1B1.3 as they were part of a common scheme or plan and part of the same course of conduct.

### C.    Credibility of CI-3

The Court rejects Mr. St. Hill's attack on the credibility of CI-3.  Most of Mr. St. Hill's trouble with CI-3's credibility comes from matters that, although grist for the cross-examination mill, are all too common among drug trafficking cooperators: (1) the fact that CI-3 was a drug trafficker herself; (2) that she was a drug addict; (3) that she had multiple sources for her drugs; (4) that she had a criminal history, including a conviction for unlawful trafficking in oxycodone; (5) that she had a history of sometimes confrontational interactions with the police; (6) that she had a history of not telling the police the truth about her boyfriends' criminal conduct; (7) that she was arrested in June 2012 during a police investigation of a pharmacy robbery in Augusta; and (8) that her story about her involvement with Mr. St. Hill changed with each interview.   From the Court's viewpoint, having carefully reviewed all of the submitted police reports, the key question is whether, despite her obvious credibility challenges, CI-3's statements about her drug dealings with Mr. St. Hill are sufficiently convincing to meet the Government's burden to demonstrate the PSR's drug quantity calculations by a preponderance of the evidence.  Taking into account all the evidence, especially the consistency among

the versions of the various cooperating witnesses, the Court concludes that CI-3's statements are sufficiently credible to meet that standard.

## III.    CONCLUSION

The Court concludes that Kevin St. Hill's January 15, 2011 New York State conviction for Tampering with Physical Evidence should count as a prior conviction for purposes of his criminal history and, in accordance with the Presentence Report, the Court assigns one criminal history point to that conviction under U.S.S.G. § 4A1.1(c).  The Court defers ruling until the sentencing hearing on Kevin St. Hill's request for a downward departure based on an over-representative criminal history under U.S.S.G. § 4A1.3(b).  The Court concludes that the drug trafficking described in paragraph 4A of the Presentence Report is relevant conduct under U.S.S.G. § 1B1.3 and accepts the Presentence Report's drug quantity calculations.  The Court will apply the base offense level of 28 in accordance with the recommendation in the PSR.  U.S.S.G. § 2D1.1(c)(6).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 11th day of July, 2013

33